235 N.J. Super. 384 (1989)
562 A.2d 813
WILLIAM F. BANDEL, PLAINTIFF-RESPONDENT CROSS-APPELLANT, AND CHRISTINE A. BANDEL, AS GUARDIAN AD LITEM OF REBECCA BANDEL, A MINOR, AND WILLIAM H. BANDEL, JR., A MINOR, PLAINTIFFS,
v.
CHARLES FRIEDRICH, M.D., DEFENDANT-APPELLANT CROSS-RESPONDENT, AND EMERGENCY PHYSICIANS ASSOCIATES, ZURBRUGG MEMORIAL HOSPITAL, JEROME W. WARREN, M.D., PENNSAUKEN MEDICAL INDUSTRIAL CLINIC, "JOHN DOE" BUSCH, M.D., GARDEN STATE COMMUNITY HOSPITAL, AND HOWARD L. PRESS, D.O., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 1989.
Decided July 19, 1989.
*386 Before Judges BILDER, R.S. COHEN and ARNOLD M. STEIN.
Richard A. Grossman argued the appeal for appellant cross-respondent (Grossman & Kruttschnitt, attorneys; Richard A. Grossman, of counsel; Barbara Ann Jacob on the brief and reply brief).
George H. Hulse argued the cause for respondent cross-appellant (Hulse & Germano, attorneys; George H. Hulse on the brief and reply letter brief).
The opinion of the court was delivered by ARNOLD M. STEIN, J.A.D.
The novel question raised in this medical malpractice action implicates the collateral source rule: whether plaintiff in a negligence action can recover damages for the reasonable value of home care and non-professional nursing care gratuitously provided by a third person. We conclude that such damages are recoverable.
Defendant appeals from the judgment entered after a liability verdict finding him 20% at fault and awarding plaintiff total damages of $720,000. Plaintiff cross-appeals, contending that the jury awarded inadequate damages. We affirm the liability verdict. We reverse the $720,000 award and remand the matter to the Law Division for a retrial on damages because the trial judge refused to permit plaintiff to prove as damages the reasonable value of the long-term home care provided him without cost by his mother.
For about three days, plaintiff had been experiencing fever, sweats and chills. On May 17, 1983, at his request, plaintiff's estranged wife and a neighbor drove him to the emergency room of Zurbrugg Memorial Hospital. There, plaintiff was seen by defendant for the first and only time. Plaintiff complained of fever and lower abdominal pain. Following an examination, defendant ordered a complete blood count and *387 urinalysis. He did not order a urine culture or a blood culture, which, according to plaintiff's experts, would have revealed the presence of bacteria in the urine and in the blood. The lab results were positive for bacteria and white cells. Defendant made a diagnosis of urinary tract infection and gave plaintiff some Bactrim tablets (a sulfa), together with a prescription for that medication. He then advised plaintiff to follow up with a visit to his family doctor in the next two or three days.
Plaintiff did not see his family doctor. Instead, he stayed at home and attempted to take care of himself. After six days, plaintiff returned to work. His employer observed that plaintiff appeared to be very ill and made arrangements for plaintiff to see Dr. James Warren at the doctor's office.
Plaintiff was experiencing a rash and hives as an adverse reaction to the Bactrim prescribed by defendant. Dr. Warren gave plaintiff Benadryl to alleviate the itching caused by the rash, and, accepting defendant's diagnosis, gave plaintiff a prescription for Tetracycline for the urinary tract infection.
The rash disappeared but the fever and chills continued. Plaintiff returned to Dr. Warren, who increased the Tetracycline dosage and ordered a urinalysis. The symptoms did not abate.
On May 29, 1983, plaintiff went to the emergency room at Garden State Community Hospital where he was seen by Dr. Busch, in the emergency room. Dr. Busch also diagnosed plaintiff's condition as a urinary tract infection but ordered a blood culture. The blood culture proved positive for streptococcus B, a virulent bacterium.
Two days later, plaintiff was admitted to Garden State Community Hospital by Dr. Press, with a diagnosis of "acute urinary infection/septicemia." The next day, after a complete physical examination of plaintiff, Dr. Press changed his diagnosis to "probable sub-acute bacterial endocarditis with mitral valve involvement." More blood tests confirmed the presence of the streptococcus B infection. A urine culture was negative *388 for bacterial infection, essentially ruling out a urinary tract infection.
Plaintiff's condition did not improve during his stay at Garden State. On June 11, 1983, he was diagnosed as having infectious endocarditis, a severe bacterial infection of the mitral valve of the heart. The infection was advancing.
According to plaintiff's experts there are three major complications of endocarditis: destruction by the bacterial infection of heart tissue, in this case the mitral valve; embolization, the dislodging of pieces of the bacterial growth and heart tissue, which then travels through the blood stream infecting other sites; and mycotic aneurysms, with the walls of blood vessels in the brain becoming infected and weakening, dilating and rupturing, frequently resulting in death.
Plaintiff was exhibiting signs of embolization and there were indications that a mycotic aneurysm was developing. A mitral valve replacement was suggested to plaintiff, who balked at first because of the 3 to 5% mortality risk involved in this surgery. However, in anticipation of such surgery, plaintiff was transferred to Our Lady of Lourdes Medical Center.
Plaintiff's health continued to decline. The bacterial growth in the mitral valve continued to grow despite antibiotic treatment. Embolization also continued. It was also discovered that an aneurysm had developed in an artery of plaintiff's brain and had tripled in size. On July 6, 1985 plaintiff was transferred to Cooper Medical Center for removal of the aneurysm and repair of the damaged artery. The surgery was successful. On July 19, 1983, plaintiff underwent surgery to replace the infected mitral valve.
Plaintiff's post-operative history was tragic. He suffered a collapsed lung and a heart attack and had difficulty maintaining his blood pressure. He also become septicemic. Plaintiff had suffered a bacterial infection of his blood stream as a result of infectious organisms flowing into his body through the intravenous *389 lines connected to him during his post-operative stay in the intensive care unit.
On July 24, 1983, plaintiff's fever rose quickly and his blood pressure dropped sharply. This caused a collapse of the artery around the recently-repaired aneurysm. Plaintiff suffered a stroke, leaving him paralyzed on his right side.
At the time of trial, plaintiff was forty-three years old with a life expectancy of approximately thirty-two years. He is totally and permanently disabled. He has difficulty communicating effectively with others and cannot completely understand what others are communicating to him. Plaintiff is unemployable. According to the testimony at trial, he will need twenty-four-hour home care for the rest of his life.
Plaintiff's negligence action sought recovery against various physicians and institutions. After several voluntary and involuntary dismissals, two defendants remained: defendant, who first  and only once  saw plaintiff in Zurbrugg Memorial Hospital's emergency room; and Dr. Warren, whom plaintiff claimed negligently adopted defendant's diagnosis that plaintiff was suffering from a urinary tract infection. Warren settled with plaintiff for $600,000. Plaintiff then proceeded to trial against defendant. The jury assessed Dr. Warren's fault at 70%, defendant's at 20%, and plaintiff's at 10%.
Plaintiff's damages were fixed at $720,000. The trial judge molded the verdict, entering judgment in favor of plaintiff and against defendant for $144,000 (20% of $720,000), plus pre-judgment interest.
Plaintiff did not claim that defendant, an emergency room physician, was negligent in failing to diagnose infectious endocarditis. He contended that defendant negligently diagnosed plaintiff's condition as a urinary tract infection and negligently failed to order blood and urinary cultures. According to plaintiff's experts, this negligence delayed the correct diagnosis and proper treatment of endocarditis.
*390 We reject defendant's contention that there was insufficient evidence for the jury to determine that plaintiff's injuries resulted from defendant's misdiagnosis of urinary tract infection. Based upon our review of the record, we conclude that the jury properly considered whether the delay in diagnosis and treatment resulting from defendant's negligence was a substantial factor in contributing to the development and progress of serious injury to plaintiff's heart and brain. Polyard v. Terry, 160 N.J. Super. 497, 511 (App.Div. 1978), aff'd 79 N.J. 547 (1979).
Defendant next contends that the negligence of Dr. Warren was a superseding, intervening act which relieved him of liability. We disagree. It was for the jury to determine whether Dr. Warren's negligent acceptance of defendant's initial incorrect diagnosis was a foreseeable event. A tortfeasor is answerable for the consequences of wrongful conduct despite the occurrence of an intervening cause of the harm so long as the intervening cause was foreseeable. Rappaport v. Nichols, 31 N.J. 188, 203-204 (1959); Torsiello v. Whitehall Laboratories, 165 N.J. Super. 311, 327 (App.Div. 1979) (jury could conclude that erroneous advice by physician regarding prolonged aspirin use was foreseeable by aspirin manufacturer who failed to warn consumers of risks involved in continued use of this over-the-counter medication).
We see no reason to step into the crossfire between plaintiff and defendant as to the applicability of the increased risk doctrine to this case: whether defendant's negligent diagnosis delayed a proper diagnosis and correct treatment, thereby increasing the risk of complications, such increased risk being a substantial factor in bringing about plaintiff's ultimate condition. Evers v. Dollinger, 95 N.J. 399, 414-415 (1984). The trial judge specifically refused to charge the increased risk doctrine. Since it played no part in the jury's consideration of the evidence and the law, it has no place in this appeal.
There was undisputed testimony at trial that plaintiff has needed and will continue to need daily around-the-clock health *391 care supervision at home for the rest of his life. His projected life expectancy at the time of trial was approximately thirty-two years.
To date, this home nursing care has been provided almost exclusively by plaintiff's mother, who moved in with plaintiff to take care of him in December 1983, a period of approximately three and one-half years at the time of trial. Mrs. Bandel has received no compensation for these day-and-night services. The trial judge refused to permit plaintiff to offer expert testimony as to the reasonable value of these home care services rendered plaintiff by his mother. He did permit plaintiff to introduce proof of the reasonable value of future services to be rendered plaintiff, presumably because his mother would not be available forever to take care of her incapacitated son.
Defense counsel seized upon the absence of proof that plaintiff had incurred any expense for home health care, and upon Mrs. Bandel's testimony that she would take care of plaintiff "as long as I have to. I have no choice, he's my son." He told the jury in summation:
[T]here hasn't been any expense at all to date. We don't know when, if ever, there is going to be one. .. .
Defense counsel's comment underscores the injustice of disallowing such damage claims. If plaintiff had been able to afford to pay someone for these essential services, he would be entitled to reimbursement. If the services had been paid by insurance, the collateral source rule would have permitted their recovery by plaintiff. Long v. Landy, 35 N.J. 44, 55 (1961). We see no reason why plaintiff should not be permitted to recover the reasonable value of these necessary services provided without cost by a caring mother.
It has long been the law in New Jersey that a tortfeasor may not benefit because of payments to or for the injured party from a collateral source. Long v. Landy, supra, 35 N.J. at 56, and cases cited therein. In Long v. Landy, the wife's recovery from her deceased husband's estate was held not to be reduced *392 by an inheritance from the husband and by payments made to her under her husband's insurance policy.
In Patusco v. Prince Macaroni, Inc., 50 N.J. 365, 368 (1967), the wife was permitted to recover medical expenses from a husband although the husband, and not she, was responsible for their payment.
In Dubil v. Labate, et al., 52 N.J. 255, 261-262 (1968), the Supreme Court held that remarriage of a surviving spouse could not be utilized by a defendant to mitigate damages in a wrongful death action.
In Rusk v. Jeffries, 110 N.J.L. 307 (E. & A. 1933), defendant was barred from showing that plaintiff, an auto accident victim, was receiving a pension. The court stated that the
general and more reasonable rule is that the amount so paid, regardless of whether paid pursuant to contract or as a gratuity, cannot operate to reduce the damages recoverable against a tort feasor. [110 N.J.L. at 311; emphasis added].
To the same effect, see Cowan v. Kaminow, 128 N.J.L. 398, 405-406 (E. & A. 1942) (court refused to reduce damages where medical expenses incurred by injured party were paid by injured party's children); and Skillen v. Eagle Motor Co., 107 N.J.L. 211, 213 (Supreme Court 1931) (injured party could recover cost of medical expenses even though the expenses had been gratuitously paid by a brother and sister).
In Tyminski v. United States, 481 F.2d 257 (3rd Cir.1973), plaintiff, decedent's widow, sought recovery on behalf of his estate in a medical malpractice action for the home nursing care which she provided her paralyzed husband for several years before his death. After reviewing the applicable case law, the Third Circuit held that New Jersey would allow recovery from the tortfeasor for nursing services gratuitously rendered by the spouse. The court stated:
The principal applied in Long and Dubil would be applied in the same manner to services paid for by another regardless of whether a person is under a legal duty to provide payment ... We discern no distinction in these cases between recovery for the value of medical services gratuitously paid for by a relative as opposed to medical services gratuitously rendered by a relative. And it seems *393 certain that New Jersey would not so limit the application of its collateral source rule. [481 F.2d at 270].
We agree. There is no reason to deny an injured plaintiff recovery for health-care services donated by a relative. There is no prospect of double recovery to this plaintiff, an objection frequently raised to application of the collateral source rule.
The judgment as to liability is affirmed. The verdict as to damages is reversed, and the matter is remanded to the Law Division for a new trial on damages.