W. Alan FILLEBROWN, Appellee
in No. 02–1080 Appellant in
No. 02–1152,

v.

STEELCASE, INC.; Bassick Co.; Gordon Manufacturing Company; John Does 1–10 (said names being fictitious), ABC Corps. 1–10 (said names being fictitious)

Steelcase, Inc. Appellee in No. 02–1152 Appellant in No. 02–1080.

Nos. 02–1080, 02–1152.

United States Court of Appeals,
Third Circuit.

Argued Dec. 13, 2002.

Decided Feb. 24, 2003.

David A. Mazie (Argued), Nagel, Rice, Dreifuss & Mazie, Livingston, NJ, for Appellee/Cross Appellant W. Alan Fillebrown.

David W. DeBruin (Argued), Jenner & Block, Washington, DC, and William R. Bumgardner, Bumgardner, Ellis, McCook & Kingsley, Clark, NJ, for Appellant/Cross Appellee Steelcase, Inc.

BEFORE: FUENTES and STAPLETON, Circuit Judges, and O'KELLEY,* District Judge.

## OPINION

STAPLETON, Circuit Judge.

Appellant, Steelcase, Inc. ("Steelcase"), appeals a $1,338,980 judgment based on a jury verdict finding it liable for a manufacturing defect in a chair it had assembled.

Appellee, W. Alan Fillebrown, has cross-appealed the judgment, claiming that the District Court erred when it reduced the jury's finding on damages by $290,000.

### I.

Fillebrown was injured when he leaned back in his chair while at work. As he leaned back, the metal spindle connecting the base of the chair and the seat broke, and Fillebrown fell to the floor. Fillebrown brought this diversity action against the chair's manufacturer, Steelcase, and the manufacturer of the metal spindle, Gordon Manufacturing Co. ("Gordon"). Fillebrown claimed that a manufacturing defect in the spindle caused it to fail. Fillebrown settled with Gordon before trial.

At trial, the parties' experts, both qualified as experts in metallurgy and materials failure, provided competing versions of what caused the spindle to break. Fillebrown's expert, Dr. J. Stephen Duerr, asserted that the break in the spindle resulted from a manufacturing defect. Duerr asserted that "particularly large machining marks" made while manufacturing the spindle had caused the spindle to develop a fatigue crack and eventually break. App. 180. Steelcase's expert countered that the spindle fracture was an overload failure resulting from prior abuse of the chair.

The jury found that the spindle broke because of a manufacturing defect and returned a verdict of $1,510,000 against Steelcase. Steelcase filed a motion for judgment as a matter of law, or in the alternative, a new trial. The District Court denied the motions for judgment as a matter of law and a new trial. The District Court, however, reduced the judgment by $290,000 to reflect pension pay-

---

* Honorable William C. O'Kelley, United States District Judge for the District of Northern Georgia, sitting by designation.

ments to be received by Fillebrown from his former employer.

## II.

■ Steelcase first argues that Fillebrown's expert's testimony concerning what caused the spindle's failure was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000). Fillebrown responds that Steelcase has waived its objections to the expert's testimony. Fillebrown's waiver argument fails because he did not raise the waiver issue when Steelcase filed its renewed motion for judgment as a matter of law in the District Court, and the Court decided the *Daubert* issue on its merits. *Houghton v. American Guar. Life Ins. Co.*, 692 F.2d 289, 294 (3d Cir.1982) ("In the absence of exceptional circumstances, an issue not raised in the district court will not be heard on appeal.") (internal quotations omitted); *Hamilton v. Komatsu Dresser Indus., Inc.*, 964 F.2d 600, 603 n. 1 (7th Cir.1992) (stating that "Plaintiffs, however, have waived these waiver arguments by failing to raise them before the district court"). We will, therefore, decide Steelcase's *Daubert* objection on the merits.

This Court reviews a district court's decision to admit or exclude expert testimony for an abuse of discretion. *Oddi*, 234 F.3d at 146. We "will not interfere with the district court's exercise of discretion unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of relevant factors." *Id.* (internal quotations omitted).

In *Daubert*, the Court set out four factors with which to evaluate whether scientific evidence was admissible: (1) whether the scientific theory or technique can be tested, (2) whether it has been subject to peer review and publication, (3) the known or potential rate of error associated with the technique, and (4) whether the theory or technique has gained "general acceptance." *Daubert*, 509 U.S. at 593–95, 113 S.Ct. 2786. Our court adds four other factors: (5) the existence and maintenance of standards controlling the technique's operation, (6) the relationship of the technique to methods which have been established to be reliable, (7) the qualifications of the expert witness testifying based on the methodology, and (8) the non-judicial uses to which the method has been put. *Oddi*, 234 F.3d at 145.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), holds that *Daubert's* gatekeeping obligation applies not only to scientific knowledge, but also to testimony based on technical and other specialized knowledge. However, *Kumho* concludes that the *Daubert* test for reliability is flexible and that "Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 142, 119 S.Ct. 1167.

The District Court, in denying Steelcase's renewed motion for judgment as a matter of law, held that Dr. Duerr's testimony was admissible. It did not abuse its discretion in so ruling.

■ There was no dispute that metallurgy and materials failure analysis are old, well-established sciences. Nor was it disputed that both experts were qualified by training and experience in these areas. Both implicitly acknowledged that a spindle like the fractured one would not be expected to fracture as it did in the absence of a manufacturing defect or abuse of the chair. Dr. Duerr opined that, in this instance, the culprit was a fatigue failure resulting from a machining mark and not an overload failure resulting from

abuse as Steelcase maintained. He supported this opinion with the following analysis:

(1) A fatigue failure would proceed from and follow a machining mark, as this one did, and an overload failure would be so situated only as a matter of chance, a highly unlikely alternative. There are no other likely explanations for the failure.

(2) The spindle was made of quite strong metal, and this makes it much less likely that it was affected by abuse and overload.

(3) The fact that the crack had progressed 90 percent of the way through the spindle before it broke in two pieces is indicative of a fatigue failure and not an abuse/overload situation.

(4) The chair was in good condition and showed no evidence of abuse.

(5) Hairline cracks that he observed in two of the three welds on the bottom side of the chair control were consistent with fatigue failure and inconsistent with overload. If the problem were overload, he "would expect either one of the cracks to be very large or ... all three welds to be broken." App. 189.

"*Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology." *Kannankeril v. Terminix Intern'l, Inc.,* 128 F.3d 802, 806 (3d Cir.1997). Dr. Duerr's opinion was reasoned and the product of a reliable methodology. It was appropriate for the jury to determine which of the experts' opinions was the most persuasive.

## III.

■ Steelcase argues, in the alternative, that the jury verdict should be vacated and that the case should be retried because the court failed to give New Jersey Model Jury Charge (Civil) No. 1.17,[1] or any other instruction, advising the jury that Fillebrown had settled with Gordon.

A district court's grant or denial of a new trial motion is reviewed for an abuse of discretion. "[T]he district court's power to grant a new trial is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading, Inc. v. Han Yang Chem. Corp.,* 9 F.3d 282, 289 (3d Cir.1993) (internal quotations omitted). *See Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230 (3d Cir.1989) ("In reviewing the propriety of a jury verdict, our obligation is to uphold the jury's award if there exists a reasonable basis to do so."). In assessing jury instructions, we exercise plenary review if the instructions misstate the applicable law. *Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 362 (3d Cir. 1999). "In the absence of a misstatement, however, we review the District Court's decisions regarding jury instructions for abuse of discretion." *Id.* We find no legal error or abuse.

At the beginning of the trial, the judge instructed the jury as follows:

---

**1.** New Jersey Model Jury Charge (Civil) No. 1.17 includes, *inter alia,* the following instructions:

Before the trial started [named defendant(s)] settled with the plaintiff in a sum of money, the amount of which is of no concern to you.

\* \* \* \* \* \*

In computing these damages you must not be concerned with the number of defendants who were originally in the case nor with the number of defendants remaining. You must not be concerned with those defendants who have made settlements with the plaintiff. You must not speculate as to what the plaintiff may or should have received in those settlements.

During the course of the trial you'll hear the names of Gordon Manufacturing and Bassick Company. Gordon manufactured and supplied the chair's metal spindle.... Although Gordon and Bassick will not appear and will not be represented during the course of the trial, you may be called upon to evaluate their involvement and to allocate their responsibility for this occurrence despite their absence.

You're not to speculate as to the reason for their absence. Such speculation plays no role in the fact-finding process.

Fill.App. 2.

After the close of the evidence and the arguments of counsel, the Court instructed the jury to ascertain the amount of money that would "fairly and fully compensate" Fillebrown for all of his damages and then carefully explained to the jury its responsibilities in apportioning liability between Gordon and Fillebrown:

I remind you that Gordon manufactured the spindle. Should you find that a manufacturing defect exists, you may have to apportion the responsibility for that defect among Steelcase and Gordon. Each of their proportionate share of fault as determined by you, the jury, shall be expressed in percentages with the assumption that the total shares equal 100 percent. Thus, if it is determined that Steelcase's proportion of the chair at fault is ten percent, then Steelcase shall only be responsible for ten percent of the damages as determined by the jury. Conversely, if Steelcase's proportionate share of fault is 90 percent, then Steelcase shall be responsible for 90 percent of the damages as determined by the jury.

App. 355–56.

Steelcase does not contend that these instructions from the Court regarding apportionment of fault and liability contain any inaccurate statement of the law. With respect to Gordon, the Court instructed that the jury should assess Gordon's responsibility after determining the total amount of damages that would fairly compensate plaintiff for his loss and that the jury should not speculate about the reasons for Gordon's absence before the Court. The record provides no reason to believe the jury did not do precisely as it was instructed.

Steelcase speculates (1) that the jury may have concluded that Gordon was no longer a going concern and that the plaintiff's recovery from all sources would be limited to the amount of liability it allocated to Steelcase, and (2) that having so concluded, it refused to follow the Court's instructions regarding allocation between Gordon and Steelcase. The only record basis for this concern of Steelcase is the following segment of the closing argument of plaintiff's counsel:

For example, you're going to have to say X percent to Steelcase and Y percent to Gordon, and whatever percentage, that the higher the percentage you apply to Gordon, the less money that Al Fillebrown would get, so, if you gave him a hundred dollars and they're 25 percent—they're 75 percent responsible and Gordon is 25 percent responsible, he only gets $75. So the amount, the higher the percentage to Steelcase, the more of the judgment they would pay. The higher the percentage to Gordon, the spindle manufacturer, the less that Steelcase will pay. The higher the amount of liability you may apportion to Gordon, the spindle manufacturer, the less amount of money that Mr. Fillebrown gets. Steelcase basically gets a credit for any liability you apportion to Gordon.

App. 326–27.

The penultimate sentence of these remarks can be understood to mean that the

higher the amount of liability the jury apportions to Gordon, the less award of money that Fillebrown will receive in these proceedings from Steelcase. As so understood, this sentence, as well as the remainder of these remarks, are accurate. While Steelcase argues that this sentence was intended to communicate that Fillebrown would get nothing beyond what he received in these proceedings, given the context, we believe it very unlikely that the jury received this message and even less likely that it ignored the Court's instruction not to speculate about Gordon's absence from the trial.

## IV.

■ Finally, Steelcase argues that the jury's liability apportionment of 85 percent to Steelcase and 15 percent to Gordon should be vacated because it was against the weight of the evidence.

Fillebrown's initial response to this argument is that Steelcase waived its objection to the verdict by failing to move for a judgment as a matter of law at the close of evidence. Motions for a new trial based on the fact that the jury's verdict was against the weight of the evidence are not barred by a party's failure to move for judgment as a matter of law at the close of all evidence. *Greenleaf,* 174 F.3d at 365. We will, therefore, consider Steelcase's argument on the merits.

"A court may order a new trial upon the motion of a party or sua sponte where there is insufficient evidence to support the verdict or where the verdict was against the weight of the evidence." *Id.* "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991).

We review the District Court's decision refusing to grant a new trial on the basis that the verdict was not against the weight of the evidence for an abuse of discretion. *Greenleaf,* 174 F.3d at 365.

Steelcase compares the jury's verdict to that in *Greenleaf v. Garlock, Inc.* In *Greenleaf,* the appellate court panel held that a jury verdict was against the weight of the evidence and ordered a new trial. That case involved several manufacturers and users of asbestos. The jury had returned a verdict allocating liability to the appearing defendants and finding the non-appearing defendants not liable on basically identical facts. *Greenleaf,* 174 F.3d at 367.

Our case is distinguishable from Greenleaf. Here, the jury apportioned 15 percent of the fault to Gordon and 85 percent to Steelcase. Steelcase's argument can be boiled down to the assertion that because Gordon manufactured the spindle, it was the more culpable party; thus, it was error for the jury to apportion 85 percent of the liability to Steelcase. Unlike *Greenleaf,* here the jury did apportion a percentage of liability to the non-appearing defendant, Gordon, and the degree assigned was consistent with the role that it played.

The jury's apportionment of liability in this case does not shock the conscience or cry out to be overturned. The jury could reasonably conclude that Steelcase, as the ultimate manufacturer of the chair, was the more culpable party because it was responsible for placing the defective chair into the stream of commerce. Also, Steelcase's trial strategy of insisting that the spindle was not defectively manufactured had the effect of minimizing the focus placed on Gordon's culpability.

## V.

Fillebrown cross-appeals the trial judge's decision to reduce his recovery by $290,000. He contends that the District

Court was merely speculating when it concluded that the jury failed to account for Fillebrown's pension in awarding damages based on the loss of future earnings. He alternatively argues that under New Jersey law, the jury was not required to account for Fillebrown's pension in awarding damages.

We will disturb a district court's determination with respect to remittitur only for an abuse of discretion. *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 355 (3d Cir.2001).

The District Court's remittitur of damages was not mere speculation. During the testimony regarding damages, Fillebrown's expert testified that Fillebrown's after-tax income, had he continued working at AT & T, would have been $88,628 per year, making a total of $886,280 over the ten years before his retirement. Reply Brief for Appellant, Ex. B at 20. The expert calculated that the present value of this future lost income was $836,000. *Id.* at 24. The expert then testified that this income should be reduced by the present value of Fillebrown's pension, which he calculated to be $290,000. *Id.* at 29. The expert also calculated Fillebrown's past wage loss as $171,750. *Id.* at 31.

The jury awarded Fillebrown $886,000 for losses from future wages, $172,000 for lost past wages, and $452,000 for pain and suffering. These numbers understandably led the District Court to conclude that the jury adopted the expert's findings as to lost past wages and future wages but failed to discount the latter to present value. The District Court also understandably concluded that the jury had also not reduced future lost wages by the amount of Fillebrown's pension, and it reduced the award by that amount. We find nothing here that can accurately be described as speculation.

Fillebrown insists that New Jersey law does not permit a reduction for future pension benefits. He points to *Rusk v. Jeffries*, 110 N.J.L. 307, 164 A. 313 (N.J.Err. & App.1933), and *Bandel v. Friedrich*, 235 N.J.Super. 384, 562 A.2d 813 (App.Div.1989), for the proposition that, pursuant to the collateral source rule, pension payments should not reduce the plaintiff's recovery.

In *Kiss v. Jacob*, 138 N.J. 278, 650 A.2d 336 (1994), the New Jersey Supreme Court held that N.J.S.A. 2A:15–97 did away with the collateral-source rule. *Id.* at 337. N.J.S.A. 2A:15–97 provides that:

> In any civil action brought for personal injury or death ... if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than worker's compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the plaintiff's family on behalf of the plaintiff for the policy period during which the benefits are payable. . . .

In the course of holding that the statute did away with the collateral source rule, the *Kiss* court noted that the collateral source rule included amounts recovered "from pensions under special retirement acts." *Kiss*, 650 A.2d at 338.

It seems clear that double recovery from pension payments to the injured is within the scope of § 2A:15–97. In *Parker v. Esposito*, 291 N.J.Super. 560, 677 A.2d 1159 (App.Div.1996), the court observed:

> Our Supreme Court addressed [N.J.S.A. 2A:15–97] in *Kiss v. Jacob* .... There, the Court held that the statute did not apply to the proceeds of a settlement with a defendant determined not to have

been a tortfeasor. The Court ruled that the statute focused on the types of benefits contemplated by the common-law collateral source rule which the statute eliminated. Those common-law collateral sources included "life-or health-insurance policies, [benefits] from employment contracts, from statutes such as workers' compensation acts and the Federal Employers' Liability Act, from gratuities, from social legislation such as social security and welfare, and from pensions under special retirement acts." *Id.* at 1161–62 (citations omitted). *See also Thomas v. Toys R Us, Inc.,* 282 N.J.Super. 569, 660 A.2d 1236, 1244 (App. Div.1995) ("The benefits that the Legislature focused upon in enacting N.J.S.A. 2A:15–97 include life- or health-insurance policies, social security and welfare payments, and pension benefits.").

Both cases cited by Fillebrown, *Rusk* and *Bandel,* were based on causes of action arising before the effective date of § 2A:15–97. Therefore, they provide no support for Fillebrown's position that New Jersey law does not allow pension payments to be taken into account. *See Bandel v. Friedrich,* 122 N.J. 235, 584 A.2d 800, 804 (1991).

■ Under New Jersey law, pension benefits must be excluded to prevent double recovery.

Because the District Judge correctly decided that the jury had failed to account for Fillebrown's pension when it made its award, its reduction of $290,000 from lost future earnings was not an abuse of discretion.

## VI.

The judgment of the District Court will be affirmed.