823 A.2d 855 (2003)
360 N.J. Super. 492
John DOE (a pseudonym), Plaintiff-Respondent,
v.
Paul ARTS, M.D., Defendant Appellant, and
Raritan Bay Medical Center, Defendant-Respondent, and
University of Medicine and Dentistry of New Jersey, Robert Wood Johnson Medical School; University Diagnostic Laboratories; Robert Wood Johnson University Hospital; David Gocke, M.D.; Girish K. Patel, M.D.; John Middleton, M.D.; and Mary Ann Quadrell, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted February 4, 2003.
Decided June 2, 2003.
*857 McDonough, Korn & Eichhorn, Springfield, for appellant (James R. Korn, of counsel; William S. Mezzomo, on the brief).
Levinson Axelrod, Edison and Robert K. Jenner, Rockville, MD (Janet, Willoughby, Gershon, Getz & Jenner) of the Maryland bar, admitted pro hac vice, for respondent John Doe (Mark V. Kuminski, Edison, on the brief, and Mr. Jenner, of counsel and on the brief).
Before Judges STERN, COBURN and COLLESTER.
*856 The opinion of the court was delivered by STERN, P.J.A.D.
Plaintiff filed this action against defendants Paul Arts, M.D. ("Arts"), the Raritan Bay Medical Center ("Raritan Bay") and others, alleging that, in 1991, following a blood test for the Human Immunodeficiency Virus ("HIV"), he was incorrectly and negligently informed by Dr. Arts that he was HIV-positive when in fact he was not, and that his case was subsequently mishandled by the other defendants. He claimed that Arts deviated from accepted standards of medical care by failing to properly read the test results, misinforming him of the results, and failing to retest him. As a result of Arts' conduct and the subsequent conduct of the other defendants, plaintiff alleged that he became depressed and suffered from physical and psychological injuries, including post-traumatic stress disorder.
All defendants were dismissed before trial, except for Arts and Raritan Bay, a hospital where plaintiff was treated for several years.[1] At the trial, the jury found that Arts had "deviate[d] from generally accepted standards of practice in his care and treatment of the plaintiff," and that his deviation was "a proximate cause of plaintiff's damages." The jury also found that Raritan Bay was not negligent. It awarded plaintiff $300,000, and Arts appeals from the resulting judgment and denial of his motion for a new trial. There is no challenge to the judgment in favor of Raritan Bay.[2]
On this appeal, Arts contends that (1) the jury's verdict was "a miscarriage of justice under the law"; (2) the trial judge "plainly erred by instructing the jurors that if they found Dr. Arts negligent he was responsible for all subsequent damages," and (3) the judge "erred in allowing plaintiff's counsel to use unidentified literature *858 against Arts." We affirm the judgment.

I.
The Human Immunodeficiency Virus ("HIV") causes the Acquired Immunodeficiency Syndrome ("AIDS"). Tests for HIV infection show whether the body has produced antibodies to the virus. In 1991, there was a two-step testing process. If the result from the first test, the Enzyme Immunoassay ("EIA") test (also called the Enzyme Linked ImmunoSorbent Assay or "ELISA" test) was negative, the individual was not considered to be infected. If the result was positive, however, the test was to be readministered. If there was a second positive reaction, the blood sample was to be retested using the Western Blot test. If both the EIA or ELISA and Western Blot test results were positive, the patient was deemed to have been infected with HIV. See, generally, R.F. v. Abbott Laboratories, 162 N.J. 596, 601-02, 745 A.2d 1174 (1999). The interval between exposure to the virus and the presence of antibodies in the blood was known to vary from two weeks to a year or more.
In May 1990, plaintiff, a thirty-three year old professional photographer, moved in with his girlfriend, S.P., the widow of P.P., who had died from AIDS-related diseases the year before. S.P. had consistently tested negative for HIV and wanted plaintiff to be tested. She set up an appointment with Arts, her family doctor, to test plaintiff for HIV infection. On March 4, 1991, plaintiff went to Arts' office, where Arts' assistant drew a blood sample.
A couple of weeks later, S.P. told plaintiff that Arts had called and said that plaintiff was HIV-positive. S.P. had spoken to Arts twice, and, then, either Arts called a third time or S.P. and plaintiff called Arts back. Plaintiff testified that Arts told him about "the bad news" over the telephone, and asked plaintiff if he had any idea where he contracted the disease. Arts told plaintiff that he and P.P. "must have been doing something together," and plaintiff thought this was "an inappropriate statement." Plaintiff stated that Arts also told him that there was no possibility of a "mistake[n]" test result, that the test was performed in two parts with the first showing that he "definitely got it" and the second showing that he "probably got some time left" to live. Plaintiff asked Arts what he should do next, and Arts replied that he did not know, but he would call back. Several days later, plaintiff spoke to Dr. Arts who referred him to Maryann Quadrell at the Robert Wood Johnson Medical Center. Arts told plaintiff "that's where [he] should go for treatment."
The written laboratory result of the HIV test by Arts stated:
TEST OR TEST GROUP WITH A VALUE OUTSIDE THE ESTABLISHED REFERENCE RANGE. * HIV-1 ANTIBODY SCR.
THIS SPECIMEN IS REPEATEDLY REACTIVE BY EIA FOR PRESENCE OF ANTIBODIES TO HIV-1.
WHILE NOT DIAGNOSTIC OF AIDS, THIS RESULT IS INDICATIVE OF POSSIBLE INFECTION AND MAY IMPLY RISK TO DEVELOP AIDS OR ARC. IN ADDITION, THERE IS A LOW INCIDENCE OF BIOLOGICAL FALSE POSITIVE RESULTS. HIV-1 AB. CONFIRM. *(01) * * *

NEGATIVE BY WESTERN BLOT FOR THE DETECTION OF SIGNIFICANT DIAGNOSTIC BANDS FOR HIV-1 (P24, GP41, GP120/160). PLEASE NOTE-AN ASTERISK TO THE LEFT OF THE TEST NAME *859 INDICATES A RESULT OUTSIDE THE REFERENCE RANGE.
IT IS RECOMMENDED THAT ALL TEST RESULTS BE RELAYED TO THE PATIENT ONLY BY PHYSICIANS OR PERSONNEL SUITABLY TRAINED TO COUNSEL THE INDIVIDUAL AS TO THE SIGNIFICANCE OF THE REPORT.
STATE REGULATIONS REQUIRE THE ASSURANCE OF PATIENT CONFIDENTIALITY WITH REGARD TO HIV TESTING. IF THIS SPECIMEN WAS NOT SUBMITTED ENCODED, THE CONFIDENTIALITY OF THE TEST RESULTS CANNOT BE ASSURED. IT IS STRONGLY RECOMMENDED THAT SPECIMENS FOR THIS TEST BE SUBMITTED WITH A PATIENT IDENTIFICATION CODE ONLY. (Emphasis added.)
Arts is a Board-certified family physician. He cared for P.P. before his death. However, Arts was not a specialist in the treatment of HIV or AIDS and treated only two people infected with HIV "for routine medical matters." From 1990 to the time of trial in 2001, he did not recall attending any seminar or lecture on HIV or AIDS. Nor had he read any textbooks or treatises on the subject.
In 1991, it was Arts' practice to telephone his patients to advise them of HIV test results and to place the laboratory report in the patient's file. Arts stated that his medical training gave him sufficient expertise to counsel individuals about the significance of the HIV test results. However, he did not consider plaintiff to be a patient and did not retain a copy of his test results.
According to Arts, on March 4, 1991, he spoke briefly to plaintiff, drew plaintiff's blood and told plaintiff that he would advise him of the results. He testified that when he received the plaintiff's test results, he could not definitively determine the significance of the two-part test and did not fully understand the ramifications of the results. Arts telephoned plaintiff and spoke to S.P. on the phone. He revealed to S.P. that plaintiff tested positive to one part and negative to the other, and he was not sure what the testing meant. He told S.P. that plaintiff should go to the Infectious Disease Clinic at Robert Wood Johnson "for further evaluation and consultation."
Dr. Arts further testified that he "could not interpret this test fully," and even if he had retested plaintiff, he "would not have accepted" a negative result "because the testing in those days was not that good," and he felt that it was not "fair" to plaintiff or to S.P. "to just ignore this." Arts expected that the appropriate person at the Infectious Disease Clinic would look at the test results, take a history, and retest plaintiff to confirm the positive result of the screening test. Arts also stated that he saw plaintiff for a total of thirty to sixty seconds before administering the test. He admitted that he did not counsel plaintiff before the blood was drawn. He also had nothing in his records to indicate how he interpreted the test results, or what he had told plaintiff or S.P. after receiving the results.
Plaintiff went to see Quadrell at the AIDS Clinical Trial Unit at Robert Wood Johnson, as suggested by Arts. Personnel at Robert Wood Johnson took plaintiff's history and administered tests, but did not retest plaintiff for an HIV infection. Plaintiff was told that he did not qualify for any clinical drug trials because his T-Cell level was too high. Quadrell referred *860 plaintiff to Raritan Bay for further care and monitoring.
Plaintiff eventually went to Raritan Bay's Treatment Assessment Program ("TAP") Clinic in November 1991, and told personnel there that he had been diagnosed as HIV-positive. The TAP Clinic monitored his progress and condition for approximately two and one-half years, but did not retest him for an HIV infection. In order to save him the cost, the TAP Clinic suggested that he obtain a copy of the original test report, which plaintiff did not do.
At trial, plaintiff's counsel read a portion of the deposition of Raritan Bay nurse Sandra Nilsson. Nilsson, former Coordinator of the TAP Clinic, stated that plaintiff told her his HIV status and that Raritan Bay never received any information from Robert Wood Johnson concerning plaintiff. In 1991, the Clinic had no practice or "requirement" to confirm whether a patient was HIV-positive or not. Many patients had "anonymous" testing done and it was difficult to obtain their records.
After he "seriously considered suicide," plaintiff started mental health counseling with therapist Jean Festa in 1994. Festa, who was suspicious of the HIV diagnosis in light of plaintiff's background and apparent good health, instructed him to obtain a copy of his HIV test results from Arts for her to review. Arts had not retained a copy of the test results because he did not consider plaintiff to be his patient. However, Arts ordered a copy which plaintiff took to Festa. Festa reviewed the results and determined that they showed that plaintiff was HIV-negative. She scheduled plaintiff for a new test, which confirmed the "negative" result.
After feeling an "initial high" about his true condition, plaintiff slipped back into a depression because he faced the "reality" that "lot[s] of things had changed" between the time of Arts' diagnosis and the correct reading. He had ended his relationship with S.P., lost his business, was unable to maintain a job, had not paid his taxes, and was "extremely depressed." He saw various doctors, took various psychotropic medications, and was still depressed at the time of trial.[3]
Dr. Michael Spodak, an expert in general and forensic psychiatry, diagnosed plaintiff with various problems, including "post traumatic stress" disorder, major depression, severe insomnia, and loss of sex drive. His condition was classified as "permanent."
Dr. Joseph Cervia, Director of the Comprehensive HIV Care and Research Center at Long Island Jewish Medical Center, testified as an expert for plaintiff in the fields of internal medicine, infectious diseases, HIV and AIDS. He stated that a physician is responsible to counsel the patient, give correct information, and make sure that the patient understands the results of the HIV tests and the next steps to be taken with respect to treatment or testing. Cervia testified that the standard of care required pre-test and post-test counseling. With a positive result, the physician must "convey" what the result means, and provide emotional and medical support and "a prompt referral for care." In addition, the physician must make sure that the patient knows how HIV is transmitted in order to prevent transmission of HIV to others. In Cervia's expert opinion, Arts failed to provide plaintiff with pre- or post-test counseling, and the failure to give post-test counseling was a proximate cause *861 of plaintiff's "continuing" treatment at Robert Wood Johnson and Raritan Bay and for his belief that he was HIV-positive for three years. According to Dr. Cervia, "because post-test counseling was not appropriately performed, [ ] the patient understood that he was HIV infected and then went on to care at Robert Wood Johnson and subsequently at Raritan Bay Medical Center."
Dr. Cervia also testified that it was improper to give test results over the phone because the results could be misinterpreted and the HIV test physician had to see the patient's reaction "face-to-face" in order to properly "support" the patient and "ensure that they understand what the results of the tests are and how they can care for themselves" by interpreting the patient's body language. Telephoning the results was a "breach of" the standard of care. Moreover, Cervia opined, within a reasonable degree of medical probability, that Arts had "misinterpreted" the test result. Cervia stated that the result was negative and that Arts interpreted it as positive.
Dr. Susan Cutchall, plaintiff's expert in family practice, testified that plaintiff was Arts' patient. She opined, within a reasonable degree of medical certainty, that Arts "deviate[d] from the standard of care for obtaining [a] blood sample" from plaintiff, because Arts did not offer pre-test counseling, which required that the actual "risk factors for possibly contracting HIV" be evaluated, and the patient be advised that "[a] positive test does not mean the patient has or will develop AIDS." Cutchall testified that a reactive ELISA test did not mean that the patient was HIV-positive. A confirmatory test, such as the Western Blot test, also had to be positive. Telling plaintiff that the positive ELISA result meant that he was HIV-positive and that the negative Western Blot result meant that he was not yet immunosuppressed did not comport with the standard of care. According to Cutchall, Arts also deviated from the standard of care by conveying incorrect information. Cutchall testified that the test results were "100 percent negative," Arts should not have told the results to anyone other than his patient, and Arts should not have revealed results over the telephone. Furthermore, she stated that post-test counseling was "absolutely required."
Dr. Nina Regevik, who ran the early HIV intervention program at Raritan Bay, testified that in 1991 false positives were very "uncommon" and that a patient with a positive result was rarely retested. Regevik also stated that it was difficult for health care providers to get HIV test results, especially because of the prevalence of anonymous tests, and that treatment centers relied on patients' disclosure of the results. Often there was no proof when a person said that he or she had a positive test result. But in order to aid patients, the clinic would accept their representations and counsel the patient.
Dr. Kathleen Casey, Raritan Bay's expert witness on internal medicine, infectious diseases and HIV, opined that Raritan Bay did not deviate from the standard of care in treating plaintiff from 1991 to 1993. She acknowledged, however, that had she had the 1991 test results, she would have told plaintiff that he was not infected with HIV but should be re-tested in the next twelve months.
Dr. Gary Weine, Arts' expert in internal medicine and HIV testing, testified that it would have been malpractice in 1991 to simply tell plaintiff that his result was negative without either retesting him or sending him to a "specialist," as Arts did. Weine opined that giving the test results to S.P. over the phone did not violate the standard of care because S.P. requested *862 that the test be performed and arranged the appointment. He, believed it was "unconscionable to call someone" and tell that person to come to the office for test results. Moreover, by sending plaintiff to "prestigious]" Robert Wood Johnson, Weine believed that Arts would have expected that plaintiff would be "appropriately evaluated." Dr. Weine conceded that plaintiff was Arts' patient and claimed that Arts gave plaintiff sufficient post-test counseling.

II.
We cannot reverse the denial of a motion for new trial based on weight of the evidence "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. "The standard for appellate review of a trial court's decision on a motion for a new trial is substantially the same as that controlling the trial court except that due deference should be made to its `feel of the case,' including credibility." Feldman v. Lederle Laboratories, 97 N.J. 429, 463, 479 A.2d 374 (1984). "[A] jury verdict, from the weight of the evidence standpoint, is impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice." Carrino v. Novotny, 78 N.J. 355, 360, 396 A.2d 561 (1979). Stated differently, "[c]redibility is truly an issue for the jury," and its verdict can be set aside only when the "conclusion could only have been motivated by a mistake, partiality, passion or prejudice." State v. Haines, 20 N.J. 438, 446-47, 120 A.2d 118 (1956). Moreover, we must recognize that people "`of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed.'" Johnson v. Salem Corp., 97 N.J. 78, 92, 477 A.2d 1246 (1984) (quoting Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 494, 126 A.2d 323 (1956)). Furthermore, the prevailing party is entitled to "the benefit of all reasonable inferences" from the proofs and "if reasonable minds could differ," the verdict must stand. Johnson v. Salem Corp., supra, 97 N.J. at 92, 477 A.2d 1246; Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969).
There is support in the record for the view that Arts did the prudent thing in referring plaintiff to the HIV experts or specialists at Robert Wood Johnson, and reasonably expected that they would take the proper course of conduct. Nevertheless, particularly given the testimony of plaintiff's experts Cervia and Cutchall, the proofs justify a finding that Arts breached the standard of care by failing to give plaintiff pre-test and post-test counseling, by misinterpreting the test results, by incorrectly advising plaintiff that he was HIV-positive, and by giving the results over the telephone rather than informing plaintiff in person. In addition, Arts may have breached standards of confidentiality by disclosing the results to S.P. See, e.g., Estate of Behringer v. Medical Ctr. at Princeton, 249 N.J.Super. 597, 638-42, 592 A.2d 1251 (Law Div.1991). Moreover, despite the fact that the duration of distress would have been substantially reduced had Robert Wood Johnson or Raritan Bay retested plaintiff, Arts can be charged with the proximate consequences of his misdiagnosis. In any event, Arts seemed unaware of the consequences stemming from the fact that, in 1991, HIV treatment centers did not generally retest patients who reported positive test results.
Dr. Cervia testified that it was appropriate for a physician to refer a patient to a medical facility when the physician was not well versed in the area of HIV testing to interpret the significance of a positive ELISA test and a negative Western Blot *863 test. But plaintiff's proofs showed that Arts did not merely refer plaintiff to Robert Wood Johnson. Arts also told plaintiff and S.P. that plaintiff was HIV-positive, and it was foreseeable that plaintiff would consequently rely upon and pass on that advice. Accordingly, the motion for new trial was properly denied, and as we will hereinafter develop, plaintiff could be held responsible for the emotional distress he proximately caused.

III.
Arts maintains that the trial judge erred in failing to charge the jury in accordance with Williamson v. Waldman, 150 N.J. 232, 696 A.2d 14 (1997), as he requested, and that the jury should have been instructed that, even if it was foreseeable that Robert Wood Johnson or Raritan Bay would deviate from the appropriate standard of care, there is only a limited period within which it was reasonable for the plaintiff to have feared HIV infection.[4]Williamson deals with emotional distress resulting from the fear that one has become infected by HIV, and Arts claims that this case falls into that category. For that reason, Arts contends that he should not bear the responsibility for the acts of the subsequent health care "specialists" at both Robert Wood Johnson and Raritan Bay who failed to retest plaintiff. Relying on Williamson,[5] Arts contends that the jury should have been instructed that to permit recovery, it must find that (1) the "defendant's negligence proximately caused genuine and substantial emotional distress," (2) the distress was "of a kind that would be incurred by a reasonable person of ordinary experience who has a level of knowledge that coincides with then-current, accurate and generally available public information about causes and transmission of AIDS," and (3) "that the damages [must be] limited to a definitive period of time, the so-called `window of anxiety' ending when the patient reasonably should have known that he or she was not infected with HIV."
In Williamson, the plaintiff, a cleaning person who had been "pricked" by a sharp medical instrument, a lancet, that had been improperly discarded, filed a complaint for negligent infliction of emotional distress resulting from her fear of becoming infected by HIV. Id. at 236, 696 A.2d 14. She instituted suit against the doctors who shared the office where she had been "pricked." Williamson v. Waldman, supra, 150 N.J. at 236, 696 A.2d 14. The Supreme Court held:
[A] person claiming damages for emotional distress based on the fear that she has contracted HIV must demonstrate that the defendant's negligence proximately caused her genuine and substantial emotional distress that would be experienced by a reasonable person of ordinary experience who has a level of knowledge that coincides with then-current, accurate, and generally available public information about the causes and transmission of AIDS.
[Id. at 249, 696 A.2d 14.]
In discussing damages, the Court ruled that "[e]motional-distress damages must be based on the fears experienced by a reasonable and well-informed person." Williamson, supra, 150 N.J. at 250, 696 A.2d 14. "Thus, emotional distress should *864 be limited to the `window of anxiety,' that is, the period after which such a reasonable and well-informed person no longer would experience continuing emotional distress," which, the Court noted, would "range from six months to a year after exposure." Ibid.
The plaintiff in Williamson was given "incorrect information" by Dr. Jerome De-Masi, her family physician, as to how many years she had to be tested to determine whether she was infected with HIV. Williamson, supra, 150 N.J. at 237, 251, 696 A.2d 14. DeMasi initially told her to be tested for seven to ten years. Ibid. Thus, the Court was faced with the question of "whether the duration of the plaintiff's emotional distress that extended beyond the "window of anxiety' was proximately caused by defendant doctors." Williamson, supra, 150 N.J. at 251, 696 A.2d 14. In that case, Justice Handler summarized the fact and issues as follows:
Four days after being pricked by the lancet, plaintiff sought medical advice from Dr. DeMasi. Unfortunately, Dr. DeMasi misinformed plaintiff that she needed to be tested for HIV annually for seven to ten years. Although Dr. De-Masi subsequently modified the period for continued testing to a "year or two," plaintiff was not informed of that until three years after the incident. The erroneous medical advice, therefore, prolonged plaintiff's reasonable fear of AIDS beyond the acceptable six-month to one-year period. We therefore must determine whether that "additional" emotional distress should be attributed to the original defendants or whether the erroneous medical advice constituted an intervening cause that was not reasonably foreseeable at the time of the original negligence. Essentially, we must determine the extent to which the bad advice can be recognized as a part of the original defendants' duty of care, the breach of which constituted, as a matter of law, a proximate cause of plaintiff's continuing emotional distress.
[Id. at 251, 696 A.2d 14.]
After analyzing the facts and law, the Court held:
The circumstances in this case [ ] militate against holding the initial tortfeasors liable for the consequences of the subsequent incorrect medical advice given to plaintiff. Our adoption of the enhanced reasonableness standard in respect of causation is based in large part on the policy consideration that ignorance concerning HIV and AIDS ought to be discouraged to the greatest extent possible through the tort law....That determination is inconsistent with the imputation to the original tortfeasors of the foreseeability that the emotional distress of a claimant fearing she had contracted AIDS could be prolonged and exacerbated by incorrect information from a medical professional .... To recognize such foreseeability as a basis for defining the duty of care and proximate cause would itself encourage medical ignorance and confusion surrounding the AIDS epidemic.
[Williamson, supra, 150 N.J. at 252-53, 696 A.2d 14 (emphasis added).]
The Williamson Court concluded:
The information allegedly provided by Dr. DeMasithat plaintiff needed to be tested for the presence of HIV for seven to ten yearswas beyond the pale of generally accepted medical evidence regarding the effectiveness of HIV testing and ought not, as a matter of law, be deemed to be reasonably foreseeable by other health-care professionals. Thus, the emotional distress attributable to Dr. DeMasi's bad advice was not the kind of foreseeable risk that serves to define both the duty of care and legal proximate cause that should be attributed to the conduct of the original defendants. Consequently, plaintiff's damages *865 based on the emotional distress arising from her fear of contracting AIDS, proximately caused by the defendants' negligence as determined by the standard of enhanced reasonableness, does not include that emotional distress that was attributable to DeMasi.
[Id. at 253, 696 A.2d 14.]
In a footnote, the Court added:
In light of the fact that the medical profession's understanding of AIDS is constantly evolving, we do not intend by this opinion to endorse causes of action in emotional distress against doctors who proffer "conservative" advice to a possibly exposed patient. Rather, we recognize that the medical advice offered in this case constitutes advice that falls far outside the parameters of medically accepted information in respect of the incubation period.
[Id. at 253, n. 2, 696 A.2d 14.]
We agree with the trial judge's conclusion that Williamson is inapplicable to this case. This is not a "fear of AIDS" case because it does not involve the emotional reaction to plaintiff's possible exposure to body fluids carrying HIV. Rather, this was a case of the misreading of test results and the rendering of a negligent diagnosis. As the trial judge said in denying a new trial:
This is a case which dealt not with whether or not the plaintiff had a fear of contracting AIDS from a putatively contaminated fluid, but here is a case in which the plaintiff was actually told by the treating physician that he had AIDS.... [Williamson] has absolutely nothing to do with this case at all.
In fact, informing a patient that he or she is HIV positive undoubtedly gives rise to emotional distress beyond the fear of contracting AIDS.
Case law from other jurisdictions provides persuasive guidance in support of our conclusion that the emotional distress damages are sustainable in this case. In Shulman v. Prudential Ins. Co. of Amer., 226 A.D.2d 164, 164, 640 N.Y.S.2d 112 (1 Dept.1996), the New York Appellate Division held that misdiagnosis of a patient as HIV-positive was actionable, where the doctor also disclosed the mistaken test results to plaintiff's partner. The court found that the "erroneous report of an HIV positive finding following blood analysis" was a ground for a claim of negligent infliction of emotional distress. See also Harvey v. Cramer, 235 A.D.2d 315, 316, 653 N.Y.S.2d 3 (1 Dept.1997) (misdiagnosis of plaintiff as HIV-positive could constitute medical malpractice). Similarly, in Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir.2000), the Second Circuit, relying on New York law, held that the misdiagnosis of a false positive HIV test result as positive can give rise to a claim of negligent infliction of emotional distress. See also Poveromo-Spring v. Exxon Corp., 968 F.Supp. 219, 228 (D.N.J.1997) (finding that the disclosure of a misread HIV test result may give rise to an action for intentional infliction of emotional distress, although dismissing the claim on other grounds); King v. Sullivan, 961 S.W.2d 287, 288-89 (Tex.App.1997) (holding that the statute of limitations did not bar a malpractice claim where a doctor misdiagnosed the patient with an HIV infection and then revealed the diagnosis to the patient's family members, even though the patient promptly obtained retesting that proved that she was not HIV-positive).
While focusing on the Williamson claim, Dr. Arts' point heading asserts a broader contentionthat "the [trial] court plainly erred by instructing the jurors that if they found Dr. Arts negligent he was responsible for all subsequent damages." We therefore address the question because it is critical to resolution of the issue before us in this case, and find no basis for reversal.
The trial judge instructed the jury that *866 if Dr. Arts is negligent, and that negligence was a proximate cause of injuries and damage to [plaintiff], Dr. Arts is responsible for all damages that flow from it, but he first has to be negligent, and it has to be a proximate cause of injury and damage. He can't hide behind the wrong doing or alleged wrong doing of somebody else or somebody [who] wasn't a party to that.[6]
Addressing the conduct of Robert Wood Johnson and Raritan Bay, the judge also stated:
Now, if you look at the conduct of Robert Wood, they're not on [sic] issue. If they did something wrong, that conduct is recoverable by the plaintiff only if you find that Dr. Arts did something wrong which was a proximate cause of the incident. In other words, if Dr. Arts is free of negligence, but you think that Robert Wood might have done something wrong, he is not responsible for that. He is only responsible for that if you find that [he] did something wrong which was a proximate cause of the injury and damage, all right?
If you find that Raritan Bay was not negligent and not a proximate cause of any injuries or not a proximate cause, but that Dr. Arts was both negligent and a proximate cause, Dr. Arts has tois responsible for all the damage whether it came from Robert Wood or whether it came from Raritan Bay.

[Emphasis added.]
The judge further instructed:
The damage that is alleged is based upon a disability, impairment, loss of enjoyment of life, and pain and suffering. If you find for the plaintiff, it [has] proven negligence and proximate cause and [that he] has sustained damages. Then he is entitled to recover the fair and reasonable money damages for the full extent of the harm caused, no more, but no less.
A plaintiff who is awarded a verdict is entitled to fair and reasonable compensation for any permanent or temporary injury resulting in disability to, or impairment of his faculties, his health, or his ability to participate in activities as a proximate result of the defendant's negligence or wrong doing.
You may consider the plaintiff's age, his usual activities, his occupation, his family responsibilities and similar relevant facts in evaluating the provable consequence of any injuries that he has sustained. You're to consider the nature, and the character, and the seriousness of the injury, the discomfort, the *867 emotional injury. You must also consider that [the] duration of any award that you make must cover the damages suffered by the plaintiff since the time of the incident up to the present time and even into the future if you find it has continued to the present or it can [] reasonably be accepted [sic] to continue into the future.
"Traditionally, our courts have held that an initial tortfeasor is liable for the results of the medical treatment of an injured victim." Williamson, supra, 150 N.J. at 252, 696 A.2d 14. Moreover, it is "well settled" that "`a tortfeasor is liable for the natural and probable consequences of the tortious act.'" Holdsworth v. Galler, 345 N.J.Super. 294, 303, 785 A.2d 25 (App.Div.2001) (quoting Ginsberg v. St. Michael's Hosp., 292 N.J.Super. 21, 35, 678 A.2d 271 (App.Div.1996)); Ciluffo v. Middlesex General Hosp., 146 N.J.Super. 476, 482, 370 A.2d 57 (App.Div.1977). See also Fosgate v. Corona, 66 N.J. 268, 272-73, 330 A.2d 355 (1974) (defendant liable for all damages unless he or she proves "reasonable apportionment"); Lucia v. Monmouth Med. Ctr., 341 N.J.Super. 95, 106-08, 775 A.2d 97 (App.Div.), certif. denied, 170 N.J. 205, 785 A.2d 434 (2001) (affirming dismissal of claim against pathology resident where resident "fully comported" with hospital protocol); Bandel v. Friedrich, 235 N.J.Super. 384, 387-90, 562 A.2d 813 (App.Div.1989), (negligence on part of treating doctors in not retesting plaintiff was not intervening event), aff'd, 122 N.J. 235, 237-38, 584 A.2d 800 (1991) (vacating grant of certification on issue). The charge in this case gives rise to no reversible error.
Moreover, an element of post-traumatic stress disorder can be permanent psychological harm, as charged here. See Collins v. Union County Jail, 150 N.J. 407, 420-21, 696 A.2d 625 (1997) (holding that plaintiff's claim of psychological harm in the form of post-traumatic stress disorder resulting from the rape by a corrections officer, constitutes a "permanent loss of a bodily function" within the meaning of the Tort Claims Act, N.J.S.A. 59:9-2(d)); Frugis v. Bracigliano, 351 N.J.Super. 328, 337, 353-54, 798 A.2d 614 (App.Div.), certif. granted, 174 N.J. 195, 804 A.2d 507 (2002) (in case on sexual abuse of elementary school students by school principal, jury should be instructed that permanent psychological harm in the form of post-traumatic stress disorder which is substantial may constitute a permanent loss of a bodily function). Thus, the trial judge did not err in charging the jury that it could consider alleged damages from the distress that occurred even after plaintiff knew that he was HIV-negative.
Finally, as noted at the outset, the jury concluded that Raritan Bay was not negligent, a finding that is not contested on this appeal, and, as already noted, defendant sought no finding that Robert Wood Johnson was negligent. Thus, even if the trial judge erred in instructing the jury that Arts could be responsible for all of plaintiff's damages, there was no finding of any intervening negligence by Robert Wood Johnson or Raritan Bay, and no claim of error with respect to the claims against those defendants. Compare Lucia v. Monmouth Med. Ctr., supra (dismissing case against pathology resident who followed hospital protocol; no burden on defendant to disprove his own culpability and prove culpability of a settling defendant).

IV.
We find no other contention to warrant development in this opinion. R. 2:11-3(e)(1)(B),(C),(E).
The judgment is affirmed.
NOTES
[1] A judgment for Arts and Raritan Bay was entered after a verdict in their favor at the first trial. We reversed that judgment and remanded for a new trial. We now review the second trial at which a verdict was entered in favor of plaintiff against Arts. Plaintiff raised no challenge on either appeal to the pretrial dismissal of the defendants other than Arts and Raritan Bay.
[2] At the request of the parties, the trial judge also asked the jury whether "defendants prove[d] by a preponderance of the credible evidence that plaintiff ... failed to bring his HIV test results to Robert Wood Johnson Medical Center" and, if so, the "percentage of [plaintiff's] damages ... proximately caused by this failure." The question related to the issue of "diminution or mitigation of damage," "not comparative fault." The jury answered the question in the negative.
[3] At the time of trial, plaintiff was serving a five-year sentence for possession of a firearm for unlawful purposes, which he asserted was a result of his depression and poor mental health.
[4] Although Arts does not expressly assert a separate contention directed to the charge on causation beyond the Williamson claim, we address it as part of the argument raised with respect to the jury instructions on causation.
[5] Arts also relies on DeMilio v. Schrager, 285 N.J.Super. 183, 666 A.2d 627 (Law Div.1995), a "fear of AIDS" case, decided two years before Williamson.
[6] The judge also advised the jury that Robert Wood Johnson is not a party to this case and the plaintiff in this case has a legal disability. That is, he cannot bring a claim against Robert Wood Johnson because of some legal requirement that wasn't met ... Further, the plaintiff doesn't have to bring a claim against each party who is potentially wrong. The plaintiff can just choose to bring a claim against multiple people. But they don't have to bring a claim against everybody.

There was no objection voiced by defendant, and he does not challenge the instructions beyond the Williamson related point and the fact that what happened at Robert Wood Johnson and Raritan Bay was "not foreseeable to Dr. Arts." Moreover, at the charge conference, Raritan Bay indicated that it did not want to "argue that [Robert Wood Johnson was] negligent," because it also was "a subsequent treater." In his summation before the jury, Arts stated:
I'm not criticizing Robert Wood Johnson. I don't know whether they failed to abide by their own policy. I have no idea what their policy is.... But that's not the important point here. The important point is what he had the right, Dr. Arts had the right to assume and expect would be done when he sent [Doe] down there.